

ORIGINAL

ENTERE! U. S. DISTRIC- COURT

NOV 2 9 2001

DISTRICT OF CALIFORNIA DEPUTY

CLERK, U.S DISTRICT COURT

NOV 2 8 2001

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

X Priority
X Send
___ Clsd
X Enter
NO JS-5/JS-6
___ JS-2/JS-3

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re GUESS?, INC. SECURITIES LITIGATION | CV 01-00871 LGB (RNBx) |
| This Document Relates To: ALL ACTIONS | ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM |

## I.   INTRODUCTION

Guess?, Inc. ("Guess"), a maker of fashion apparel, experienced financial difficulties during the 2000 calendar year. As a result, its stock value dropped and the current securities litigation was instituted against defendants Guess, Maurice Marciano, Paul Marciano, Armand Marciano and Brian Fleming. The class action complaint alleges violations of the Exchange Act, section 10(b), Securities Exchange Commission ("SEC") Rule 10b-5, and the Exchange Act, section 20(a). Defendants' bring the present motion to dismiss all claim for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)").

Docketed
Copies (NTC Sent)
___ JS - 5 / JS - 6
___ JS - 2 / JS - 3
___ CLSD

## II.   FACTUAL AND PROCEDURAL BACKGROUND

The following facts are derived from the complaint, records referenced in the complaint, or from public records properly before the Court[1]:

Guess is primarily engaged in the business of designing, marketing and distributing casual clothing, accessories, and related consumer products. Compl. ¶ 1. It markets its clothing lines through two primary distribution channels: (1) wholesale distribution, through which Guess sells its product to large upscale department stores; and (2) retail distribution, which consists of sales directly to the public through full-price retail and discount factory outlet stores owned and operated by Guess. Id. For the fiscal year that ended on December 31, 1999 (``fiscal 1999"), Guess recorded roughly equal revenues from its wholesale and retail distribution channels. Id.

Maurice Marciano is one of the founders of Guess. Id. ¶ 14a. He served as Co-Chairman of the Board of Directors and Co-Chief Executive Officer of Guess through the time covered by this action. Id. He is also one of the largest shareholders of Guess. Id. Paul Marciano shared Maurice Marciano's duties as Co-Chairman of the Board of Directors and Co-Chief Executive Officer of Guess. Id. ¶ 15a during this time period. Paul Marciano further served as Guess's President and Chief Operating Officer from

---

[1]See, e.g., Fed. R. Evid. 201; Plevy v. Haggerty, 38 F. Supp. 2d 816, 821, 835 (C.D. Cal. 1998) (SEC filings, stock prices and news articles may be considered under a motion to dismiss).

2

September 1992 to December 2000. Id. He also enjoyed sizable holdings of Guess stock. Id.

Another defendant, Armand Marciano, served as Guess's Executive Vice President and Assistant Secretary during the time period covered by this complaint. Id. ¶ 16a. He was also one of the company's largest shareholders and served on the Guess Board of Directors during this time. Id. The last individual defendant, Brian Fleming, served as Guess's Executive Vice President and Chief Financial Officer from July 20, 1998 to November 16, 2000. Id. ¶ 17a.

On February 14, 2000, Guess announced that it had net earnings for fiscal 1999 of $51.5 million on revenues of $599.7 million. It also announced that its inventories as of December 31, 1999 were valued at $106.6 million. Id. ¶ 54. At the same time, Guess admitted that "certain inventory costs and related costs of goods should have been recognized in the third quarter [of fiscal 1999] rather than the fourth quarter." Id. As a result of this accounting issue, Guess restated its 1999 third quarter results and announced that adjustments in the fourth quarter "have produced unusually high gross margin rates for the fourth quarter, which should not be expected in future results." Id. Guess also announced that it was "strengthening controls and procedures surrounding its inventory cost accounting to assure the accuracy of future quarterly inventory and gross margin results, and the company has engaged outside consultants to assist it in doing so." Id. ¶ 55.

In its SEC 10-K annual report, filed March 30, 2000, Guess discussed its current business situation and made projections for the future. At the end of fiscal 1999, Guess operated 92 full-price and 54 factory outlet stores in the United States. Defs.' Ex. 1 at 11. These factory outlet stores were used primarily to sell outdated fashion items and other slow-moving merchandise at severely discounted prices. Compl. ¶ 28. In its 10-K report, Guess stated: "We plan that our retail division will be our primary growth initiative over the next three to five years." Defs.' Ex. 1 at 12. Supporting this growth was Guess's plan to open a number of new stores, increase the average size of the new stores, and increase sales productivity of all stores. Id.

At the same time, Guess discussed its opening of a "new, automated distribution center in Louisville, Kentucky" to replace its distribution center in Los Angeles, California. Id. at 14. Its "new, 500,000 square-foot facility . . . is expected to . . . allow [Guess] to reduce distribution operating costs per unit, reduce [its] shipping costs and provide better service to [its] customers." Id. This new center was expected to be fully operational in the second quarter of fiscal year 2000. Id. Guess stated that it uses "fully integrated and automated distribution systems" in its distribution centers, providing "timely, controlled, accurate and instantaneous updates to the distribution. Id. at 19. During the fourth quarter of 1999, enhanced ability to estimate reserves through improved processes and more current and accurate data led Guess to revise its

4

estimate of certain reserves. Id. at 27. This resulted in a reduction of cost of sales of $2.3 million and an increase of gross margin of $2.3 million, or 2.4%. Id. Guess also represented that it valued its inventory at the lower of cost or market. Compl. ¶ 61.

In cautioning against its forward-looking statements, Guess stated that "Certain statements . . . including those relating to . . . our cost containment efforts . . . are forward-looking statements. Such statements involve risks and uncertainties, which may cause results to differ materially from those set forth in these statements." Defs.' Ex. 1 at 29. The 10-K went on to identify "[i]mportant factors that could cause actual results in future periods to differ materially from our forward-looking statements," such as:

1)    Possible cancellation of wholesale orders, which could have a material adverse effect on Guess's financial condition and results of operations;

2)    The success of Guess's programs to strengthen its inventory cost accounting controls and procedures, which could have a material adverse effect on its financial condition and results of operation; and

3)    The success of technology to be used in Guess's new distribution center, which could have a material effect on its financial condition and results of operation.

Id. Nevertheless, Guess represented that the results were in accordance with GAAP. Compl. ¶ 56.

At some point in March 2000, an inventory control committee allegedly reported the existence of approximately $30 million in inventory that was 1 ½ to 2 ½ seasons old. Id. ¶ 46. A month later, on April 27, 2000, Guess filed an S-3 Registration Statement. Defs.' Ex. 3 at 128. In the S-3, Guess related:

> The efficient operation of our business is very dependent on our information and accounting systems. . . . Due to our recent rapid growth and increased international sourcing, we have experienced some difficulties with our current management information and accounting systems. In addition, segments of our current information and accounting systems are manually intensive. We have in the past and may in the future experience errors in entering and processing information. While we are taking additional action to reduce the risks associated with these situations, including to purchase a new enterprise-wide information system that could integrate all of our business functions, we can give no assurances that these risk will not have a material adverse effect on our results of operations and financial condition.

Id. at 140. The S-3 then refers the reader to the "Management's Discussion and Analysis of Financial Condition and Result of Operations." Id. at 141.

6

There, Guess reports that, on February 16, 2000, it filed an amendment to its quarterly report on Form 10-Q for the three and nine month periods ended September 25, 1999. Id. at 151. It did so in order to restate Financial Statement and revise the Management's Discussion because it had learned that certain inventory costs and related cost of sales should have been recognized in the third quarter. Id. Later, Guess reiterated its belief that "during the fourth quarter of 1999, we enhanced our ability to estimate reserves through improved processes and more current and accurate data. As a result, we revised our estimate of certain reserves. This resulted in a reduction of cost of sales of $2.3 million and an increase of gross profit or [sic] 2.4%." Id. at 153.

In Guess's May 1, 2000 Press Release, the company discussed its rising inventory levels. Compl. ¶ 58. "Inventories were $135.5 million [for the first quarter of 2000] . .. . versus $106.6 million at year-end and $70.9 million a year ago. . . . [I]nventories were up 25.1% from year-end and 71.7% from a year ago. The majority of these higher inventory levels are the result of significantly increased product sales, substantially higher wholesale backlog and our retail expansion program. . . . Our wholesale backlog continues at high levels reflecting the popularity of our brand and product." Id. The Form 10-Q, filed on May 16, 2000 for the first quarter, confirmed the results announced in the press release and stated the results were in accordance with GAAP. Id. ¶ 59.

7

On May 4, 2000, an analyst, David P. Campbell of Merrill Lynch, issued a report rating Guess stock "Long Term Accumulate." Id. ¶ 62. Campbell noted that Guess inventories included only "$10m of excess merchandise . . . The company plans to liquidate the excess inventories through their outlet stores and off price channels over the next two quarters." Id.

In June, however, Bloomberg News Service reported that the stock dropped 2 3/8 or 15% after a Salomon Smith Barney broker stated that the company inflated its backlog numbers by including orders from its retail stores in its wholesale backlog. Id. ¶ 63. On June 23, 2000, Maurice Marciano said the email was "completely false because we do not include sales to our own stores in wholesale backlog." Id. During the same time period, in June 2000, the inventory control committee allegedly reported that $20 million in inventory could only be sold, if at all, at severely discounted prices. Id. ¶ 46. A few days after Marciano's statement, on July 6, 2000, Guess announced that the "Company had unfilled wholesale orders from department and specialty stores customers of $162.4 million, a 62% increase from a year ago." Id. ¶ 64. Paul Marciano commented, "[d]emand for our brand and product remains strong." Id.

In its July 31, 2000 Press Release announcing its second quarter earnings, Guess reported that its earnings increased 72.3% to 12.1 million from earnings the year before of $7.0 million. Id. ¶ 67. Paul Marciano commented: "We are very pleased with our seventh consecutive quarter of strong revenue and

earnings growth." Id.

Maurice Marciano commented, in a concurrent statement with the Press Release:

> While we are still working through some excess inventory by primarily utilizing wholesale off-price and factory store channels, the amount of inventory overage at the end of the second quarter is less than $15 million. The year-over-year comparison for inventory at the end of the second quarter is exaggerated by several factors: inventories at July 1, 2000 include $14.2 million for Guess Canada, the abnormally low inventory in the year-ago period, the inventory necessary for new stores, and inventory necessary to support our retail comparable sales gains. The remaining increases in inventory is in line with sales trends and is necessary to support our substantially higher wholesale backlog. We expect to have the inventory overage substantially cleared by early in the fourth quarter.

Id. ¶ 68. Guess's August 14, 2000 SEC Form 10-Q contained the quarterly financial statements and reported inventories of $173,711,000, costs of goods sold of $100,080,000 and accounts payable of $65,559,000. Id. ¶ 69. Again, inventory was represented at the lower of cost or market. Id. Unfilled

9

wholesale backlog orders increased 61.4% to $162.4 million. Id.

Following these reports, several analysts, including Lee F. Backus of the Buckingham Research Group rated Guess positively. Id. ¶ 73. During this time, from August 31 to September 15, 2000, Armand Marciano and Maurice Marciano sold 101,600 shares of Guess common stock for over $2.1 million in proceeds. Id. ¶ 74. These sales consisted of Armand Marciano's selling of 81,600 common shares and Maurice Marciano's selling of 20,000 common shares. Id. These amounts represented 1.3% of Armand's holdings and .12% of Maurice Marciano's holdings. See Defs. Exs. 8-11. The average selling price of these shares was slightly under $18.00, $15.00 off the high price during the relevant time period.

On September 25, 2000, Guess announced that it was lowering its third-quarter earnings forecast, expecting $.35 to .38 per share. Compl. ¶ 75. Securities analysts had projected earnings of $.44 per share. Id. One security analyst, John P. Rouleau, diagnosed the problem this way: "They were overly aggressive in planning their sales and inventory levels for the spring, summer, and fall seasons. . . . They've got too much stuff." Id. ¶ 76.

The November 9, 2000 Press Release acknowledged that third-quarter profits fell 60% and that third-quarter net-income fell to $5.64 million, or $.13 a share. Id. ¶ 77. Its Form 10-Q, filed November 14, 2000, reported that the results were in accordance with GAAP and that the inventories were valued at the lower of cost or market, with an inventory of $164,214,000. Id. ¶ 78. the Form 10-Q also reported that Guess's order backlog stood at

10

$133.3 million. Id.

In November 2000, Guess announced that Paul Marciano would no longer be President of the Company and Fleming resigned as the company's Chief Financial Officer. Id. ¶ 81. These personnel moves were followed on January 26, 2001 with a Press Release. Id. ¶ 82.

The January release announced Guess's expectation of a diluted loss per share for the quarter ended December 31, 2000 in the range of $.27 to $.31. Id. This would include the recording of non-recurring charges of approximately $14 million, consisting of inventory write-down charges to address the valuation of aged or impaired inventory, asset impairment charges, store closing costs and other non-recurring expenses. Defs.' Ex. 5. Guess also determined that it was necessary to restate its earnings over the first three quarters of 2000. Id. These planned restatements suggested that earnings were overstated by $.02 in the first quarter, $.13 in the second quarter, and understated by $.06 in the fourth quarter. Id. This was needed because certain costs that should have been expensed were capitalized and the existence of unrecorded inventory accruals, triggered by the relocation from the Los Angeles distribution facility to Louisville. Id. This resulted in an overstatement of certain assets and understatements of vendor obligations for inventory purchases. Id. Carlos Alberini, President and Chief Operating Officer said, "We have been working diligently to improve controls in our financial and operational planning processes." Id.

11

On March 8, 2001, Guess acknowledge a net loss for the fourth quarter of 2000, including a $15.6 million pre-tax special charge. Defs.' Ex. 7 at 238. This charge consisted of $5.7 million in inventory write-downs to address the valuation of aged or impaired inventory; $4.5 million in restructuring charges, including store closing costs, $4.1 million to write-down impaired assets, including certain fixed assets and an investment in an internet company; and $1.3 million in other charges. Id. Evaluating the overall picture for the year, Maurice Marciano commented, "The challenging retail environment in the Fall contributed to lower sales and margin pressures. This, combined with our excess inventory situation, had a significant negative impact on our profitability for the period." Id. The reported remarks assumed the restatement of the company's previously reported results for the first three quarters of fiscal year 2000. Id.

In Guess's Form 10K for fiscal year 2000, it reported that it recorded special charges of approximately $10.3 million to reduce inventories to the lower of cost or market. Defs. Ex. 2 at 78. In the auditors' section of the report, it was reported that $12.9 million in inventory reductions were taken to reduce inventories to the lower of cost or market.

Following some preliminary stages of the litigation, the current Consolidated Amended Class Action Complaint was filed in this Court on July 9, 2001. The complaint alleges two causes of action: 1) violation of section 10(b) of the Exchange Act, and

12

SEC Rule 10b-5, and 2) violation of section 20(a) of the Exchange Act for actions taken between February 14, 2000 and January 26, 2001.

**III. LEGAL STANDARDS**

   **A.   Federal Rule of Civil Procedure 12(b)(6)**

   Federal Rule of Civil Procedure 12(b)(6) provides for dismissal when a complaint fails to state a claim upon which relief can be granted. See Fed.R.Civ.P. 12(b)(6). A complaint fails to state a claim if it does not allege facts necessary to support a cognizable legal claim. See Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1990); Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-34 (9th Cir. 1984).

   In reviewing a Rule 12(b)(6) motion, the court must presume the truth of the factual allegations in the complaint, and draw all reasonable inferences in favor of the non-moving party. See Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995); see also Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). Dismissal under Rule 12(b)(6) is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73 (1984) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957))(dismissal appropriate only where "plaintiff can prove no set of facts in support of his claim which would entitle him to relief")); see also Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1152 (9th Cir. 1989). The issue is not whether the plaintiff will

ultimately prevail, but whether the plaintiff is entitled to offer evidence to support the plaintiff's claim. See Usher, 828 F.2d at 561.

**B.    The Private Securities Litigation Reform Act**

Federal Rule of Civil Procedure 8(a) requires only that a defendant be given fair notice of the factual allegations supporting the complaint. See Fed. R. Civ. P. 8(a); Leatherman v. Tarrant Cty. Narcotics & Intelligence Unit, 507 U.S. 163, 168 (1993). In 1995, Congress enacted the Private Securities Litigation Reform Act. In re Silicon Graphics Inc. Sec. Litig., 183 F.3d. 970, 973 (9th Cir. 1999). Its purpose was to deter opportunistic private plaintiffs from filing abusive securities fraud claims, in part, by raising the pleading standards for private securities fraud plaintiffs. Id. Congress raised the pleading bar in three principal ways.

First, it requires that "[i]n any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). This requires a plaintiff plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct. Silicon Graphics, 183 F.3d at 974.

Second, a complaint must "specify each statement alleged to have been false or misleading, [and] the reason or reasons why the statement is misleading." Finally, "if an allegation regarding [a] statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). If a complaint does not meet the pleading requirements of the PSLRA, the court, upon motion of the defendant, shall dismiss the complaint. See 15 U.S.C. § 78u-4(b)(3)(A).

**IV. ANALYSIS**

Neither party disputes that the PSLRA applies to this case. Plaintiffs attack a variety of statements attributed to the defendants in this case. Defendants advance several arguments in response, but the Court focuses its attention on the factual sufficiency of the allegations directed at establishing the falsehood and at establishing scienter. In particular six core assertions form the backbone of the allegations in the complaint, arranged for ease of reference:

1) Various defendants were aware no later than February 2000 that the Company's internal computer systems were inadequate to track Guess's inventory. See Compl. ¶ 6.

**Basis (1):** "top members of Guess' financial reporting organization participated in a 'financial roundtable group' which met on a weekly basis for the purpose of discussing and resolving financial

15

reporting issues within the company." <u>Id.</u> ¶ 14d. Fleming attended these meetings and "regularly reported the results . . . to each of the other Individual Defendants." <u>Id.</u>

**Basis (2):** During the financial roundtable meetings Guess's Director of Internal Audit reported that Guess's internal computer systems were not accurately tracking the company's inventory as it was transported between the Los Angeles and Louisville distribution centers. <u>Id.</u> ¶ 14e. As a result, defendants knew that Guess was unable to reconcile the inventory reports prepared by its distribution centers, leading to overvaluation of the inventory on the company's financial statements. <u>Id.</u>

2)    Various defendants were aware that the company was not recording expenses associated with its inventory purchases. <u>See</u> <u>id.</u> ¶ 14(f).

**Basis:**    In March 2000, the Director of Internal Audit reported that the company's computer system failed to record expenses when Guess personnel failed to enter certain corresponding entries. <u>Id.</u> This failure was reportedly wide-spread. <u>Id.</u>

3)    Various defendants knew that Guess's inventory was overvalued because as much as $30 million consisted of

inventory that was 1 ½ to 2 ½ seasons old–a lifetime in the fashion world–and therefore had to be sold at severe discounts. See id. ¶ 14g.

**Basis:** In March 2000, various defendants formed an "inventory control committee" to track the company's inventory. This group met on a weekly basis. Id. During these meetings, defendants were informed about excess inventory. Id.

4) Guess fired its entire internal audit staff in June 2000 and this was never disclosed to the public in order to conceal the alleged financial skullduggery at Guess. See id. ¶ 14b.

5) Guess inflated its wholesale backlog by including orders from its retail stores, even as management denied the practice. See id. ¶ 14i.

**Basis:** Guess's backlog increased as demand was significantly declining and large wholesale customers, including Macy's, were demanding to return substantial amounts of product that could not be sold. See id. ¶¶ 45, 48. Combined with a "weekly inventory report" defendants knew that sales were slowing and that inventory needed to be marked down. Id. ¶ 45. Maurice Marciano visited the Louisville distribution center several times early in 2000 and spoke with the company's vice-president of operations almost every day throughout the year. Id. ¶

17

16c. Despite this the backlog numbers grew much larger than any sales consummated 90 to 120 days later. See id. ¶¶ 51, 52.

6)   The defendants concealed the negative information.

**Basis:**   Knowing all the information found above, none of it was revealed, some public statements are alleged inconsistent with this information, and some of the defendants sold stock. See, e.g., id. ¶ 17h (concealment); ¶ 74 (stock sales).

The defendants' primary attack on these pleadings is two-fold. First, they maintain that the plaintiffs fail to allege the underlying facts with the requisite specificity. Def. Mem. of P & A ("Def. Mem.") at 17-20. Second, they argue that the pleadings fail to create the "strong inference" of recklessness necessary under the PSLRA and Silicon Graphics. Def. Mem. at 7-14; see also id. at 14-22 (arguing statements not false).

**A.   Specificity of the Pleadings**

A quick scan of the supporting reasons for the allegations shows that many rest on the existence of "weekly inventory reports," "financial roundtable meetings," and the "inventory control committee." These sources presumably supplied the individual defendants and the company with information that did more than just put them on notice there might be a problem, it provided such detailed information that their conduct crossed the

line into deliberately reckless or conscious misconduct. See, e.g., Compl. ¶ 6 ("From these weekly reports and discussions . . . defendants knew that the Company's inventory was materially overstated")

The similarity between these sources of information and those in Silicon Graphics is striking. In Silicon Graphics, the plaintiff's allegations pointed to three types of internal status reports that alerted officers to "serious production and sales problems." 183 F.3d at 984. The complaint then alleged that "the officers conducted several meetings during which they entered into a 'conspiracy of silence.'" Id. at 985. As the basis of these allegations, the Silicon Graphics plaintiffs' based them "upon the investigation of their counsel, which included a review of SGI's filings, securities analysts reports and advisories about the company, press releases issued by the company, media reports about the company and discussions with consultants, and believe that substantial evidentiary support will exist for the allegations [ ] after a reasonable period of discovery." Id. at 985.

The Ninth Circuit rejected these allegations as insufficient under the PSLRA. Id. at 985. The Silicon Graphics court stated that "a plaintiff must provide, in great detail all the relevant facts forming the basis of her belief." Id. (emphasis added). The complaint in Silicon Graphics failed to include adequate corroborating details to support a "strong inference" of deliberate recklessness. Id. The Ninth Circuit pointed to the

19

plaintiff's failure to identify:

    1) the source of information with respect to the reports;

    2) how the plaintiff learned of the reports;

    3) who drafted them;

    4) which officers received them; and

    5) an adequate description of the contents, "which would include some specifics from those reports as well as such facts as may indicate their reliability."

Id. To quote the Silicon Graphics court, "[Plaintiff] would have us speculate as to the basis for the allegations about the reports, the severity of the problems, and the knowledge of the officers. We decline to do so." Id. These same shortcomings apply to the current complaint.

Plaintiffs argue that they adequately identify the speaker-the Director of Internal Audit-who reported the information to the other individual defendants. Pls.' Opp'n at 19. It is unclear whether this argument is meant to encompass both the information relayed at the financial roundtable meetings, at the inventory control meetings, or in the various reports. For the present purposes the Court will assume it to apply to all the information alleged. Nevertheless, this alone fails to satisfy the pleading requirements of the PSLRA.

The Court is provided no information as to who drafted these reports, what date the key reports or statements were made, what specifically the reports contained, or any other corroborating

20

details. See Silicon Graphics, 183 F.3d at 985. This is insufficient pleading. See id. Plaintiffs' reliance on In Re USA Talks.com Sec. Litiq., 2000 U.S. Dist. LEXIS 14823 *1, *8 (S.D. Cal. 2000), is misplaced. There, the allegations generally discussed the availability of daily red and yellow flag reports, alerting management of severe technical problems with a fledgling company that asserted its technology was working well. Id. at *10. The district court found these allegations sufficient under the PSLRA. Id. The significant differences between that case and this one is found in the size of the companies and the relative nature of the claims.

In USA Talks.com, the company only had four employees. Id. at *11. The inferences of knowledge were thus much stronger than they are in the present case, where the defendants were in charge of a large corporation bringing in over $500 million dollars in annual revenue. Additionally, the relevant information in the cases was different. In USA Talks.com, knowledge of the mechanical difficulties was enough to create scienter. Id. at *8. Here, even granting the reports identified problems, there is no indication that the reports had sufficient grasp of the scale posed by these problems to create a "strong inference" of "deliberate recklessness". The "facts" alleged in the complaint only suggest the possible worst case scenario. See Compl. ¶ 15f ("Guess had as much as $30 million") (emphasis added); ¶ 46 (three months after ¶ 15f, the number is $20 million). They give no indication of how this number was calculated, what the range

of possible values was, or anything else. In evaluating the adequacy of the pleadings and scienter, these details matter. See Silicon Graphics, 185 F.3d at 985. As Guess had notified the public of potential problems in its accounting systems, see Defs.' Ex. 3 at 140, plaintiffs must plead specific facts showing that the failure to actually reduce its financial projections based on the ongoing investigation of a contingent problem, with unknown potential ramifications-small or large-was so faulty that it amounts to deliberate recklessness. The few "facts" in this complaint fail to show, with adequate specification, when, where or how the company identified $30 million in aged inventory; how, when or where the company realized its wholesale sales were slowing and why this was so obvious that it constituted deliberate recklessness to still forecast strong sales; or how, how much, when or where the company and executives lodged retail sales on the wholesale backlog.

Nor does In re McKesson HBOC Inc. Sec. Litig., 126 F. Supp. 2d 1248 (N.D. Cal. 2000), support plaintiffs. Although the district court in McKesson held that the failure to identify the name of sources was not always a pleading failure, the facts pled, including specific conversations corroborated by reports of widespread fraudulent practices were sufficient to state a claim. Id. at 1254-56, 1272, 1276 (describing fraud as "breathing" and "so well substantiated"). Here, there is no indication that Guess adopted any policy as egregious as the booking of entirely contingent contracts as sales, followed by hiding the side

22

letters that established the contingencies. See id. at 1255. Nor is there sufficient corroboration for the Court to credit these vague allegations. This case presents the situation, recognized by the McKesson court, where "Congress meant to prohibit general allegations that corporate officers' statements were contradicted by unspecified 'negative internal reports' seen by completely unidentified sources." Id. at 1271. Alleging the involvement of the Director of Internal Audits in communications, without supplying an adequate basis for the allegations, is insufficient to rise above this prohibition.

At the hearing, plaintiffs placed great stress on a recent case from the Northern District of California, In re Cylink Securities Litigation, 2001 U.S. Dist. Lexis 15734 (N.D. Cal. 2001). The Court finds the limited analogy between the cases is insufficient to alter its analysis. In Cylink, the allegations that survived the motion to dismiss identified five specific transactions where GAAP was violated through premature revenue recognition. Id. at *14-15. The "exchange provision [in one of the deals] made it clear that the customer did not have a fixed purchase commitment" and that deal alone overstated quarterly revenue by 12.5%. Id. at *15. Combined with other evidence provided in an SEC complaint alleging fraudulent revenue recognition practices and the size of the overstatements (overstating revenues from 46% to 97%), the Court concluded the facts alleged gave rise to a strong inference of scienter. Id. at *4, *15-16.

23

In contrast, the Cylink court had previously dismissed the complaint because its earlier allegations were insufficient to satisfy the PSLRA's pleading requirements. Id. at *6-7. In the earlier complaint, the plaintiffs "first pointed to the existence of internal controls . . . to imply that the magnitude of the premature revenue recognized was beyond the capability of a few "rogue" sales representatives and thus must have been known by defendants." Id. at *7. Plaintiffs then alleged that the magnitude of the problem indicated that defendants either knew or disregarded the problem with deliberate recklessness. Id. Although the current complaint is slightly more detailed than the original complaint in Cylink, it fails to rise to the level of specificity or to create the strong inferences of scienter, based on the character and amount of the specific transactions at issue, that the Cylink court found satisfied the PSLRA's requirements.

Nor do the other cases cited by plaintiffs help their cause. In each, more specific information was alleged that allowed the court in each case to adequately evaluate the ultimate allegations of fraud and to find corroboration in the specific details related. See, e.g., In re 2theMart.com Sec. Litig., 114 F. Supp. 2d 955, 960 (finding a "clear disparity" between statements and the known business reality, and "much more precise" pleadings than Silicon Graphics). Defendants are correct to compare the pleading in this case to the allegations in a Northern District of California case, In re Autodesk, Inc. Sec.

24

Lit., 132 F. Supp. 2d 833, 839 (N.D. Cal. 2000) (granting motion to dismiss for similar reasons).

Additionally, based on the current allegations, taken as a whole, Plaintiffs have failed to plead facts sufficient to support a strong inference of scienter. See, e.g., Autodesk, 132 F. Supp. 2d at 843-44 ("Defendants are correct in their argument that plaintiffs must do more than allege that these key officers had the requisite knowledge by virtue of their 'hands on' position"). The insider stock sales provide no support for a conclusion of scienter. See Silicon Graphics, 183 F.3d at 987. Between the significant drop-off from the stock's high during the class period (high: $33.00, apx. average at sale: $22) and the minuscule percentages involved by only two of the four defendants, the Court finds this information is not probative of scienter. See Ronconi v. Larkin, 253 F.3d 432, 435 (9th Cir. 2001) ("when insiders miss the boat this dramatically, their sales do not support an inference that they are preying on ribbon clerks who do not know what the insiders know"); Silicon Graphics, 185 F.3d at 987 (7.7% and 6.9% stock sales provide no indication of scienter). The violations of GAAP are just as consistent with the existence of an accounting problem of unknown scope as they are with intentions to hide the performance of the company.[2] Plaintiffs have provided insufficient factual

_____

[2]The Court reads the defendants' acknowledgment of accounting problems, Defs.' Ex. 3, recognition of an inventory overage of $15 million, and plaintiffs' allegation of a $20 million overage in June as consistent with a technology and operating upgrade gone awry in the midst of rapid expansion.

25

allegations to support the inference that the failure to recognize the eventual costs of these problems was attributable to fraud, rather than a lack of caution, a lack of solid information, a belief that it was part of the company's grand expansion plans, or a momentary surplus of hubris. And, finally, the layoffs of the internal audit department may be attributable to the creation of the inventory and accounting problems, as well as a failure to provide sufficient answers to management. Frankly, on the allegations in the complaint, the Court cannot find sufficient factual support to believe fraud is any more likely than mismanagement or growing pains as the cause of any misrepresentations-and thus the motion to dismiss will be granted, with leave to amend within twenty (20) days of this order.

### B.   Amending the Pleadings

In approaching the amended complaint, the Court agrees with the Autodesk court in its conclusion that the pleading for a securities claim such as this should be more straightforward. See Autodesk, 132 F. Supp. 2d at 842. The Autodesk court adopted a sensible requirement to provide a framework for complaints such as the present one. The Court finds that court's solution to the requirements of the PSLRA persuasive.

Accordingly, if plaintiffs choose to amend the complaint, the Court requires the following:

---

Allegations concerning the scope of the problem and how they were reported may overcome this problem created by the current status of the complaint.

Separately, for each alleged false or misleading statement, plaintiffs shall

1. State the false or misleading statement;

2. State whether the statement was written or oral;

a. If the statement was written, identify the document in which it appeared -- that is, provide the title and author of the document, the date it was prepared, and, if not a publicly-available document, name of the person or persons who reviewed it;

b. If the statement was oral, state when and under what circumstances the statement was made, and by whom; if an allegation regarding an oral statement is not made on personal knowledge, state with particularity all facts upon which plaintiffs formed the belief that one or more of the defendants made the statement at the time and place at which it is alleged to have been made.

3. State why the statement was false or misleading at the time it was made, and state with particularity all facts upon which plaintiffs formed the belief that the statement was false or misleading;

a. If plaintiffs allege that the falsity of the statement is shown by conflicting information in internal reports, identify the report (title, author, date prepared, recipient(s)) and indicate the portion of the report that contradicts the false or misleading statement;

b. If plaintiffs allege that the falsity of the statement is shown by contemporaneous information inconsistent with a particular statement, state with particularity what the contemporaneous information was, what the source of the information was, who had the information, and how plaintiffs learned of the information.

4. State particular facts giving rise to a strong inference of a degree of recklessness that strongly suggests actual intent to deceive;

a. If plaintiffs allege that defendants received or possessed documents or information that was at odds with the alleged false or misleading statement, state all the relevant facts supporting this belief;

b. If plaintiffs allege that the information was contained in documents, state the title, date, and contents of such documents (with particularity), the identity of the person or persons who drafted such documents, the identity of the person or persons who reviewed such documents, how plaintiffs learned of the existence of the documents, and how plaintiffs know that defendants received these documents;

c. If plaintiffs allege that the information was in a form other than written, state the source or sources of their information (how they learned of this information allegedly possessed by defendants) and how they know that the defendants possessed this information; and

5. With regard to allegations concerning the liability of the

28

individual defendants for "group-published" information, plaintiffs must indicate the statements that they contend fall under the doctrine.

Autodesk, 132 F. Supp. 2d at 846; see also In re Secure Computing Corp. Sec. Litig., 2001 U.S. Dist. LEXIS 13563 *1, *11 (commenting on a well-drawn pleading where facts were repeated for various statements).

**IV.  CONCLUSION**

Because the complaint in this case fells to meet the specificity and scienter pleading requirements under the PSLRA, the Court GRANTS the defendants' motion to dismiss with leave to amend within twenty (20) days of this order.

IT IS SO ORDERED.

Dated: _Nov. 27, 2001_

LOURDES G. BAIRD
United States District Judge

29